# Exhibit C

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4

   KENNETH HOCH,                    :    CIVIL ACTION
5                                   :
        Plaintiff,                  :
6                                   :
        vs.                         :
7                                   :
   BARBARA T. ALEXANDER, et         :
8  al.,                            :
                                    :
9       Defendants.                 :
                                    :
10      -and-                       :
                                    :
11 QUALCOMM INCORPORATED,           :
                                    :
12      Nominal Defendant           :    NO. 11-217 (RGA)

13

14                             - - -

                               Wilmington, Delaware
15                             Wednesday, February 29, 2012
                               2:00 o'clock, p.m.
16

17                             - - -

   BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
18

19                             - - -

   APPEARANCES:
20
              FARNAN LLP
21            BY:  BRIAN FARNAN, ESQ.

22
                        -and-
23

24                                  Valerie J. Gunning
                                    Official Court Reporter
25

```
 1    APPEARANCES (Continued):

 2
                 BARRACK, RODOS & BACINE
 3               BY:  ALEXANDER ARNOLD GERSHON, ESQ. and
                      MICHAEL A. TOOMEY, ESQ.
 4                    (New York, New York)

 5
                      Counsel for Plaintiff
 6

 7
                 POTTER, ANDERSON & CORROON
 8               BY:  RICHARD L. HORWITZ, ESQ.

 9
                          -and-
10

11               CRAVATH, SWAINE & MOORE LLP
                 BY:  RACHEL G. SKAISTIS, ESQ.
12

13
                      Counsel for Defendants
14

15                        - - -

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in chambers beginning at

 4    2:00 p.m.)

 5

 6              THE COURT:  Good afternoon.  Let's all be

 7    seated.

 8              So this is Hoch versus Alexander, which is case

 9    11-217.

10              I look around at people I know.  Mr. Farnan, who

11    have you got with you?

12              MR. FARNAN:  Good afternoon, your Honor.  This

13    is Arnold Gershon and Michael Toomey from Barrack, Rodos &

14    Bacine in New York.

15              THE COURT:  Good afternoon.

16              MR. GERSHON:  Good afternoon.

17              MR. TOOMEY:  Good afternoon.

18              THE COURT:  Welcome to Delaware.

19              MR. GERSHON:  Thank you.

20              THE COURT:  You're getting our A-plus weather.

21              Mr. Horwitz?

22              MR. HORWITZ:  Hello again.

23              THE COURT:  Nice to see you.  It has been way

24    too long.

25              MR. HORWITZ:  The rain wasn't too bad.
```

1              Rich Horwitz from Potter Anderson on behalf of

2    the defendants, and with me is Rachel Skaistis from Cravath,

3    Swaine & Moore in New York.

4              THE COURT:  Good afternoon, Ms. Skaistis.

5              MS. SKAISTIS:  Good afternoon.

6              THE COURT:  So I appreciate that you all have

7    worked on a scheduling order.  And it looked like, in fact,

8    if I didn't misunderstand -- actually, I didn't read

9    Mr. Farnan's cover letter, but it looked like the order

10   itself had everything agreed to.  Is that right?

11             MR. FARNAN:  Yes, your Honor.

12             MR. GERSHON:  Yes.

13             MS. SKAISTIS:  That's correct.

14             THE COURT:  So the only thing I actually wanted

15   to change, was not a big deal, was the pretrial conference,

16   which you wrote in as October 3rd, 2013, which is a

17   Thursday.  I wanted to make it October 4th, 2013, at

18   11:00 a.m.  That would be a Friday.

19             Is that all right?

20             MR. FARNAN:  Yes, your Honor.

21             MS. SKAISTIS:  Yes, your Honor.

22             THE COURT:  And so hold on a second.  Let me

23   just read Mr. Farnan's letter here about the I.R.S.

24             All right.  So, defendants, you believe a stay

25   is appropriate for 45 days.  And, plaintiff, you don't think

1      a stay is appropriate.

2               So why?

3               MS. SKAISTIS:  We think a stay is appropriate.

4      First of all, it's a short stay.  We've asked for 45 days

5      because we think we'll hear back from the I.R.S. by the end

6      of March.

7               The question --

8               THE COURT:  And so somebody from the government

9      said the answer is in the mail and you believe it?

10              MS. SKAISTIS:  Pretty much.  Yes, your Honor.

11              THE COURT:  All right.

12              MS. SKAISTIS:  The question we've posed to the

13     I.R.S. is a question that we think if the I.R.S. agrees with

14     Qualcomm's position, this case is dispositive.

15              Plaintiff's case, which is a derivative case, so

16     it's based on harm to Qualcomm as opposed to harm to any

17     individual, is based on the claim that because the 2011

18     shareholder vote on certain amendments to Qualcomm's

19     long-term incentive plan, they claim that vote was

20     defective, and therefore payments under the plan won't be

21     deductible.

22              We've asked the I.R.S. to give us an issue

23     resolution agreement stating that the 2011 vote complies

24     with all tax laws.  If they did that, then the I.R.S.

25     wouldn't challenge deductibility of any payments based on

1   the shareholder vote.  And then there's no harm to Qualcomm,

2   and then plaintiffs no longer have a case.

3                  THE COURT:  All right.  I understand that.

4                  Do you agree that if I.R.S. issues its ruling,

5   that that resolves the case?

6                  MR. GERSHON:  We do not, your Honor.

7                  THE COURT:  I don't know why I'm not surprised.

8                  So would the same length of time that she

9   took -- well, what's your view?

10                  MR. GERSHON:  Well, we first learned about the

11   question of getting review from the Internal Revenue Service

12   on November 29th.  We had served a document request in July

13   and we had given the defendants until September 15th or 16th

14   to respond.

15                  They responded and said nothing about the

16   Internal Revenue Service until on November 15th, we wrote a

17   letter saying, where is your production?

18                  Two weeks after that, November 29th, they said,

19   well, we have been talking to the Internal Revenue Service

20   since -- what did they say --

21                  MS. SKAISTIS:  November 9th.

22                  MR. GERSHON:  November 9th.  And we think a stay

23   of 60 days is in order in order to give the Internal Revenue

24   Service a chance to respond.

25                  We had several responses to that, including the

1      fact that it wasn't timely to raise an objection to

2      discovery so late, having served response to our document

3      request on September 12th.

4               They wait until November 29th to tell us about

5      the Internal Revenue Service.  And only after we say, where

6      are the documents, we came to an agreement, which is

7      embodied in the joint status report, that said that we will

8      schedule discovery so that if they will produce documents,

9      we will take 60 days to look at them, and we will re-confer

10     during the week of February 20th to see where we are.  And

11     they said they would produce documents.

12              The answer is, not all the documents promised

13     have been produced, including nothing from what they've said

14     to the Internal Revenue Service.  We had no idea what has

15     gone on there.

16              And --

17              THE COURT:  So I think I'm hearing what you're

18     saying.  In terms of the one sentence, that if the I.R.S.

19     agrees with, I guess essentially that the payments,

20     presumably, the incentive plan are tax deductible, do you

21     have a case left after that?

22              MR. GERSHON:  Yes.

23              THE COURT:  Okay.  And why is that?

24              MR. GERSHON:  First of all, the Internal Revenue

25     Service decision is not dispositive because the question of

1     what is the correct tax law is something that the courts

2     must decide based on the statute and the regulations, not

3     some decision of the commissioner or some agent not to

4     enforce the Internal Revenue Code.

5               THE COURT:  Well, I mean, I think her argument

6     is that -- because probably theoretically, you're right, the

7     judges have law, not the I.R.S.

8               But the I.R.S. says in effect -- I mean, isn't

9     that the basis of your action, that there may be harm to

10     the corporation because they'll have to -- they won't be

11     able to deduct as much -- they won't be able to deduct these

12     things?

13               MR. GERSHON:  That is one theory of recovery.

14     The other theories of recovery are that the vote was

15     unfairly taken and we have proposed to amend the complaint

16     to add claims under SEC Rule 14(a)(4), which governs the

17     content of the proxy ballot, which we are working on the

18     Amended Complaint even as we speak.

19               THE COURT:  Okay.

20               MR. GERSHON:  And also that under Delaware

21     corporation law, the vote was coercive.  And the reason for

22     this is that what the stockholders voted on was an amendment

23     to an old plan.

24               If the amendment vote is approved, if the vote

25     of the stockholders is to approve the amendment, then the

1  new plan goes into effect, but if they vote against the

2  plan, the old plan stays in effect.  The plans are virtually

3  identical, substantially identical, and our argument is that

4  the stockholders should have had a chance to vote up or down

5  on each plan.  Otherwise, the vote is a Hobson's choice, an

6  illusory vote.

7            THE COURT:  So there's some harm to, I guess,

8  Qualcomm or --

9            MR. GERSHON:  Yes.

10            THE COURT:  -- that they -- it is not just the

11  deductibility of the payments to the directors or to

12  whomever their president, whoever they were paid to, but

13  it's just that payments were made at all?

14            MR. GERSHON:  Yes.

15            THE COURT:  Okay.

16            MS. SKAISTIS:  Your Honor, that --

17            THE COURT:  I mean, he's saying, presumably --

18  what he's saying is, this is not what we're saying.  This is

19  not what our complaint says right now, but this is what our

20  complaint may say in the future.

21            MS. SKAISTIS:  But this is essentially what

22  their complaint says.  I mean, if you think about what

23  Mr. Gershon just said, it all has to do with the fairness of

24  the 2011 vote.  Was it coercive?

25            THE COURT:  Well, but the I.R.S. --

```
 1              MS. SKAISTIS:  And that's exactly the issue we

 2   presented, exactly what Mr. Gershon said.  It's what is in

 3   their papers.

 4              THE COURT:  But the I.R.S. isn't going to decide

 5   whether they complied with the SEC rules, is it?

 6              MS. SKAISTIS:  But the SEC rules, what the

 7   I.R.S. is going to talk about is whether what was given to

 8   shareholders in the proxy, whether that complied with the

 9   requirements for adequate shareholder approval under the

10   tax laws.

11              That's the only harm and that's the only

12   issue -- the harm being that because the shareholder vote

13   was defective, then payments made by Qualcomm aren't tax

14   deductible.

15              There's no other harm to Qualcomm.  I mean, it's

16   harm to Qualcomm.  It's not any individual shareholder.

17   This is a derivative case.  I think the thing that has been

18   a little frustrating, and I don't agree with Mr. Gershon's

19   recitation of the procedures.

20              THE COURT:  It's apparent you don't agree.

21              MS. SKAISTIS:  But we should be on the same side

22   here.  Right?  Everybody in this room should have as a goal

23   that Qualcomm gets tax deductions, so -- because it's all

24   for the good of the company.  Money that's recovered goes

25   back to Qualcomm.
```

1      So it's all -- you know, it's a good thing that

2   the I.R.S. says, yes, the shareholder vote was compliant,

3   and you can make tax deductions.

4           THE COURT:  All right.  So one of the other

5   things that Mr. Gershon said, I take it, was, you asked for

6   60 days standstill or whatever back in November, and I lost

7   the exact thread, but the idea was, you would have a ruling

8   from the I.R.S. after that?

9           MS. SKAISTIS:  Well, we actually, when we first

10   discussed originally our approach to the I.R.S., and the

11   approach was actually, you know, it wasn't -- it was through

12   Qualcomm's tax people, who said, look, if there's a tax

13   issue here, potential issue, we want to get the right

14   answer.

15           Qualcomm is something called a compliance

16   assurance program.  Normally, this issue of deductibility,

17   this is years down the road.  I mean, nothing has happened

18   yet.  There hasn't even been a taxable event.  The

19   company has not submitted anything to the I.R.S. for a

20   deduction.

21           So this is --

22           THE COURT:  These are different, perhaps

23   different merits arguments.

24           MS. SKAISTIS:  Correct.  But there's nothing

25   imminent.  I mean, this is in the future.  So when we

1    originally made the approach to the I.R.S. in November, the

2    concern was, this is so not right, are we going to convince

3    anybody at the I.R.S. to take on the issue.

4              THE COURT:  And it has become ripe since

5    then?

6              MS. SKAISTIS:  Well, the I.R.S. agreed to take

7    it on.  And we approached them.  We gave the I.R.S. --

8    you've never asked for what we've given to the I.R.S. on

9    this issue.  We're happy to give it to you.  It's copies

10   of the complaint, plaintiff's briefs, all of the

11   pleadings.

12             We gave it to them on November 9th.  We were

13   hopeful that they would take on the issue.  The reason we

14   agreed to -- to reconvene -- and it's in the joint status

15   report the week of February 20th -- so we could update

16   plaintiffs on our status with the I.R.S.

17             Since then, we learned that they would agree to

18   take on the issue.  They've substantially reviewed the

19   materials we've given them.  And they have indicated,

20   obviously, to the I.R.S., and as you said, it's not a

21   promise, but they've indicated that they should be done with

22   their review by the end of March and we should hear.

23             THE COURT:  All right.  So other than the fact

24   that there might be a little bit of discovery that turns out

25   to be for naught if, in fact, you're right, that this turns

1      out to be case dispositive, because it's also entirely

2      plausible that if I said, okay, stayed for 45 days, on

3      the 44th day, you would be here saying, can we have

4      another 45 days?  I mean, this could continue on for quite

5      awhile.

6                    MS. SKAISTIS:  It could.

7                    THE COURT:  So my inclination is to say, you

8      know, make your initial disclosures and you can send each

9      other interrogatories, and maybe even wait -- wait 16 days

10     to do it so that if you get to the 45th day and the I.R.S.

11     has resolved it -- and even though it certainly sounds like

12     Mr. Gershon is going to be -- so I guess I'm inclined to

13     think, you know, we ought to just proceed on parallel tracks

14     and go -- go get started here.

15                   MS. SKAISTIS:  The only plea I'm going to make

16     is, you know, we've already spent a lot of time and energy

17     briefing this in front of Judge Schiller.  You know, our

18     concern is this is something that, you know, 45 --

19                   THE COURT:  I'm sorry.  Briefing what in front

20     of Judge Schiller?

21                   MS. SKAISTIS:  I mean, we've done motions to

22     dismiss.  We did a motion to dismiss papers.  We filed a

23     motion for reconsideration.

24                   The company spent some money on this.  We did do

25     an initial production.  I now have a six-page discovery

1    letter to respond to.  And I'm not saying we can't go

2    forward and do this, but this all has a cost associated with

3    it.  And if, you know, again, we're trying not to waste

4    shareholder value here.  That's the point of their suit.  I

5    just wonder if we can't wait, you know, even 30 days to

6    continue on with these efforts to see if we hear something

7    back.

8              MR. GERSHON:  Well, of course, if they get a

9    ruling that they like and decide to make a motion, we're

10    going to need the discovery anyway because we're entitled to

11    oppose.

12              MS. SKAISTIS:  I don't believe the motion we'd

13    make you'd need discovery for.

14              THE COURT:  Well, in any event, rather than

15    backing-and-forthing on that, which I'm not in a very good

16    position right now to agree with one or the other of you,

17    why don't we just -- I guess there is no actual formal

18    motion for a stay.  Right?  There's --

19              MS. SKAISTIS:  There's not.

20              THE COURT:  Okay.  So in the absence of formal

21    motion, I'm not going to grant a stay.  Qualcomm wants to

22    save money, so probably shouldn't file a formal motion

23    because I'm going to deny that most likely.

24              And, you know, maybe you can work it out between

25    you as to the exact timing, but otherwise, I think you ought

1    to go ahead and -- I mean, it would probably be cheapest for

2    Qualcomm to just go away, but I don't think they're going to

3    do that.

4              MS. SKAISTIS:  Right.  Yes.

5              THE COURT:  So they filed the suit and, you

6    know, if it turns out that it's completely meritless and you

7    find out in 45 days, it will still be a lot cheaper for

8    Qualcomm.

9              So I'm not going to do that.

10             Is there anything else we should discuss?

11             MR. GERSHON:  We have nothing further.

12             MS. SKAISTIS:  Nothing further, your Honor.

13             THE COURT:  All right.  So, Mr. Farnan, I hate

14   to make you do it, but can you change that one thing and

15   resubmit it?  And I will sign it.

16             MR. FARNAN:  Yes, your Honor.  That's the only

17   date to be changed?

18             THE COURT:  Yes.  I think.  Right?  Because

19   everything else is agreed to.

20             MR. FARNAN:  Yes, your Honor.

21             THE COURT:  And the trial date is fine.  And

22   since you agreed to everything else, I wasn't really

23   double-checking it, or I mean I wouldn't double-check it

24   because you agreed to it.

25             Okay?

```
1            MR. GERSHON:  All right.

2            THE COURT:  All right.  Well, thank you for

3    coming down from New York on such a miserable day.  And nice

4    to meet you all.

5            And nice to see you, Mr. Horwitz and Mr. Farnan.

6    And I'm sure it won't be more than another day or two until

7    I see you all again.

8            All right.  Have a good day.

9            (Conference concluded at 2:15 p.m.)

10                         -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```