IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENNETH HOCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-217-RGA |
| | ) | |
| BARBARA T. ALEXANDER, et al., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| QUALCOMM INCORPORATED, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendants respectfully submit this Notice to advise the Court of the recent

decision in SC Note Acquisitions LLC v. Wells Fargo Bank, N.A., No. 12-cv-1011 (JFB)(AKT),

2013 WL 1233544 (E.D.N.Y. March 27, 2013) (attached hereto), in which the court dismissed

claims, which, like Counts II and III here, were premised on alleged adverse tax consequences

that had not occurred.

The SC Note plaintiff claimed that defendants caused a trust to lose its tax-

advantaged status as a Real Estate Mortgage Investment Conduit ("REMIC"). Id. at *1-2. The

court, however, held that the purported injury was "purely hypothetical at this juncture" because

"the Internal Revenue Service has not yet determined that the trust has lost this status, and the

trust has not yet suffered any monetary harm as a result of defendants' allegedly incorrect

interpretation of the tax laws". Id. at *1. The court also rejected the notion that "tax liability is

imposed as a matter of law, and that defendants' actions" caused harm "regardless of whether the

IRS actually collects additional taxes". Id. at *7. The court reasoned that "plaintiff's interpretation of tax law may be incorrect" and that if it "were to allow this case to proceed prior to an IRS determination and plaintiff was victorious in this lawsuit, but the IRS later determined that defendants did not endanger the REMIC status, plaintiff would receive a windfall". Id. Concluding that it could not "decide a case with a hypothetical injury that may never occur", the court dismissed the relevant claims. Id.; see also id. (ruling that "plaintiff has not suffered an injury" until such time that IRS or Tax Court "ever determine that the Trust may no longer be classified as a REMIC").

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Evan R. Chesler
Rachel G. Skaistis
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Tel: (212) 474-1000
EChesler@cravath.com
RSkaistis@cravath.com

Dated: April 11, 2013
1101825 / 36664

By: /s/ Matthew D. Stachel
    Richard L. Horwitz (#2246)
    Peter J. Walsh, Jr. (#2437)
    Matthew D. Stachel (#5419)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    pwalsh@potteranderson.com
    mstachel@potteranderson.com

*Attorneys for Defendants*

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
**(Cite as: 2013 WL 1233544 (E.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
SC NOTE ACQUISITIONS, LLC, Plaintiff,
v.
WELLS FARGO BANK, N.A., Midland Loan Ser-
vices, Inc., and LNR Partners, LLC, Defendants.

No. 12–cv–1011 (JFB)(AKT).
March 27, 2013.

Russell L. Penzer and Eric J. Horbey, Lazer,
Aptheker, Rosella & Yedid, Melville, N.Y., for
Plaintiff.

Gregory A. Cross and Colleen A. Mallon, Venable,
LLP, Baltimore, M.D., Michael K. Madden, Ven-
able LLP, New York, N.Y., for Defendants.

**MEMORANDUM AND ORDER**
JOSEPH F. BIANCO, District Judge.

*1 SC Note Acquisitions, LLC ("plaintiff")
commenced this action against Wells Fargo Bank,
N.A. ("Wells Fargo"), Midland Loan Services, Inc.
("Midland"), and LNR Partners, LLC ("LNR")
(collectively, "defendants") alleging various causes
of action under state law, including breach of con-
tract, breach of the covenant of good faith and fair
dealing, and negligence. The gravamen of plaintiff's
complaint alleges that defendants, as Trustee, Mas-
ter Servicer, and Special Servicer of a commercial
mortgage-backed securities trust, adopted an inter-
pretation of tax law that will cause the trust to lose
the status that had allowed it to avoid paying cer-
tain taxes. However, plaintiff does not dispute that
the Internal Revenue Service has not yet determ-
ined that the trust has lost this status, and the trust
has not yet suffered any monetary harm as a result
of defendants' allegedly incorrect interpretation of
the tax laws.

Defendants now move to dismiss the complaint

pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure. For the reasons set forth below,
defendants' motion is granted. Specifically, plaintiff
has not demonstrated that this case is justiciable un-
der Article III because the IRS has not actually de-
termined that the trust's tax status has been jeopard-
ized. Accordingly, any injury suffered by plaintiff
is purely hypothetical at this juncture. In addition,
plaintiff's one claim that alleges wrongdoing not re-
lated to the trust's tax liability, a breach of contract
claim solely against LNR, is also dismissed because
plaintiff cannot satisfy either the contemporaneous
ownership rule required to bring a derivative action,
or the no-action clause contained in the Pooling and
Servicing Agreement that bars lawsuits by certific-
ateholders of the trust.

I. BACKGROUND
A. Factual Background
The following facts are taken from the com-
plaint, including documents incorporated by refer-
ence. These facts are not findings of fact by the
Court. Instead, the Court assumes these facts to be
true for purposes of deciding the pending motion to
dismiss, and will construe them in a light most fa-
vorable to plaintiff, the non-moving party.

1. The Pooling and Services Agreement
On November 29, 2005, defendants and J.P.
Morgan Chase Commercial Mortgage Securities
Corporation ("J.P.Morgan") executed a pooling and
services agreement (the "PSA"). (Compl.¶ 5.) Pur-
suant to the PSA, J.P. Morgan created a commercial
mortgage-backed securitization trust called "J.P.
Morgan Chase Commercial Mortgage Securities
Corp. Commercial Mortgage Pass–Through Certi-
ficates, Series 2005–CIBC 13" (the "Trust"). (*Id.* ¶
6; Decl. of Colleen M. Mallon in Supp. of Defs.'
Mot. to Dismiss Pl.'s Compl. ("Mallon Decl.") Ex.
A, Pooling and Servicing Agreement.) [FN1] The
Trust is assigned various mortgage loans, the prin-
cipal balance of which exceed $2.7 billion.
(Compl.¶ 6.) Wells Fargo is the Trustee of the
Trust, Midland is the Master Servicer, and LNR is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

the Special Servicer. (*Id.* ¶¶ 7–9.)

### 2. REMIC Status

**\*2** Plaintiff alleges that "[f]undamental to the economic viability of the Trust is having the Trust qualify as a Real Estate Mortgage Investment Conduit" ("REMIC") as defined by the Internal Revenue Code. (*Id.* ¶ 11.) This classification "permits the Trust to be treated as a pass-through entity for federal income tax purposes, rendering it exempt from paying income tax at the entity level on the otherwise taxable income generated from the Mortgage Loans, thus avoiding double taxation." (*Id.*) Under the PSA, two REMICs were created within the Trust, an Upper–Tier REMIC and a Lower–Tier REMIC. (*Id.* ¶ 13.) Section 10.01(f) of the PSA states that neither Midland nor LNR may "knowingly or intentionally take any action" or "cause the Trust Fund to take any action" that could "endanger the status of the Lower–Tier REMIC or the Upper–Tier REMIC as a REMIC" or "result in the imposition of a tax upon the Lower–Tier REMIC or Upper–Tier REMIC." (*Id.* ¶ 49.)

Plaintiff claims that Wells Fargo, acting through LNR, caused the Trust to transfer certain mortgage loans to special purpose entities ("SPEs"). (*Id.* ¶ 50.) The ownership interests in these SPEs became property of the Lower–Tier REMIC. (*Id.* ¶ 51.) Plaintiff alleges that the Internal Revenue Code does not permit a REMIC to own these types of assets (*id.* ¶ 53), and therefore, the REMICs lost their REMIC status and the Trust was rendered "economically non-viable" (*id.* ¶ 55). Defendants claim that plaintiff erroneously interprets the Internal Revenue Code and that the SPEs have no effect on the Trust's status as a REMIC. (Defs.' Mem. at 1.) Plaintiff does not dispute that the Trust has not currently had any tax imposed on it by the IRS due to the transfer of certain loans to SPEs. Moreover, plaintiff concedes that the IRS may never determine that the Trust no longer qualifies for REMIC status.

### 3. Other Alleged Misconduct

The PSA also obligates defendants to adminis-

ter the Trust in certain other ways. For example, LNR and Midland are required to:

> service the Mortgage Loans in accordance with the higher of the following standards of care: (1) in the same manner in which, and with the same care, skill, prudence and diligence with which the Master Servicer or the Special Servicer, as the case may be, services and administers similar mortgage loans for other third party portfolios and (2) the same care, skill, prudence and diligence with which the Master Servicer or the Special Servicer, as the case may be, services and administers similar mortgage loans owned by the Master Servicer or the Special Servicer, as the case may be, with a view to the maximization of timely recovery of principal and interest on a net present value basis on the Mortgage Loans or the Specially Serviced Mortgage Loans, as applicable, and the best interests of the Trust and the Certificate holders ....

(Mallon Decl. Ex. A, Pooling and Servicing Agreement, at 119; *see also* Compl. ¶ 25.)

**\*3** Plaintiff claims that LNR's interests conflict with the best interests of the Trust. (Compl. ¶ 26.) The complaint alleges that LNR has serviced the loans "in such a manner so as to maximize its fees regardless of the best interests of the Trust or the Certificateholders." (*Id.* ¶ 32.) For example, plaintiff claims that LNR rejected an $80 million offer to purchase the two underlying notes in a property, although LNR now anticipates that the Trust will recover less than $78 million through foreclosure or sale to another entity. (*Id.* ¶ 41.)

### 4. Plaintiff's Interest in the Trust

Plaintiff owns a minority share in a company that holds a minority interest in Philips South Beach, LLC, owner of The Shore Club Hotel in Miami. (*Id.* ¶ 20.) The Trust held two promissory notes, which were secured by a mortgage on the hotel. (*Id.*) The mortgage went into default. (*Id.* ¶ 22.) On approximately September 14, 2009, LNR assigned all of the Trust's interest in the loan to J.P.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

Morgan, thereby divesting the Trust of any interest in this loan. (*Id.* ¶¶ 22, 38.) In November 2010, J.P. Morgan filed a foreclosure action on this loan in Florida state court. (*See* Mallon Decl. Ex. C, Docket Sheet of *JPMCC 2005–CIBC13 Collins Lodging, LLC v. Philips South Beach, LLC,* No. 10–61128 CA 06 (Fla. 11th Judicial Circuit).) FN2

According to defendants, plaintiff was formed as an LLC on October 26, 2011. (*See* Mallon Decl. Ex. B, Articles of Organization of SC Note Acquisitions LLC.) FN3 Plaintiff thereafter purchased a single certificate in the Trust. Plaintiff admitted at oral argument that it purchased an interest in the trust for the purpose of bringing this lawsuit. (Oral Arg., Jul. 17, 2012, at 19 (The Court: "On the contemporaneous ownership doctrine, I don't think you dispute the fact that essentially what your client did was purchase this interest for purposes of the lawsuit. Isn't that pretty much—" [Plaintiff]s Counsel]: "That's correct.").)

### B. Procedural History

Plaintiff commenced this action in New York State Supreme Court, Suffolk County, on January 30, 2012. On March 1, 2012, defendants removed the case to this Court. On April 2, 2012, defendants filed a motion to dismiss plaintiff's complaint. Plaintiff filed its opposition on May 2, 2012, and defendants replied on May 16, 2012. The Court held oral argument on July 17, 2012. The Court has fully considered all of the submissions of the parties.

### II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund*

*v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir.2010) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.

*4 The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), setting forth a two-pronged approach for courts deciding a motion to dismiss. The Supreme Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly,* 550 U.S. at 556–57) (internal citation omitted).

The Court notes that in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (internal citations omitted), *aff'd in part and rev'd in part on other grounds sub nom., Lentell v. Merrill Lynch Co.,* 396 F.3d 161 (2d Cir.2005).

### III. DISCUSSION

Defendants move to dismiss the complaint under numerous theories, including that plaintiff lacks standing to sue regarding a potential future revocation of the Trust's tax status, that plaintiff lacks standing to bring a derivative action since plaintiff did not own shares in the Trust at the time of the alleged wrongdoing, and that plaintiff did not satisfy the requirements of the no-action clause of the PSA. For the reasons set forth below, the Court grants defendants' motion to dismiss.

### A. Standing and Ripeness
#### 1. Legal Standard

"The jurisdiction of federal courts is defined and limited by Article III of the Constitution[, and] the judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.' " *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). "Justiciability is a term of art embracing the constitutional and related jurisprudential limitations placed upon the jurisdiction of Federal courts." *Jones v. Deutsch,* 715 F.Supp. 1237, 1242 (S.D.N.Y.1989). To determine whether a case is justiciable under Article III, a court must consider the doctrines of "ripeness, standing, mootness, advisory opinion, and political question." *Id.*

*5 Although they are separate doctrines, ripeness and standing "virtually transect one another" in this case, *id.,* because when "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1139 (9th Cir.2000) (citation and internal quotation marks omitted); *see also Brennan v. Nassau Cnty.,* 352 F.3d 60, 65 n. 9 (2d Cir.2003) (per curiam) (" 'The doctrines of

ripeness and standing are intertwined.... If a plaintiff has not yet suffered a concrete injury-in-fact, he or she lacks standing, even though it is possible that in the future such an injury will occur. Yet such a suit could also be said to suffer from a lack of ripeness because the circumstances have not yet developed to the point where the court can be assured that a live controversy exists.' " (quoting 15 James Wm. Moore, Moore's Federal Practice § 101.71 (3d Ed.2003)) (alteration in original)).

"It is axiomatic that '[t]here are three Article III standing requirements: (1) the plaintiff must have suffered an injury-infact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision.' " *Cooper v. U.S. Postal Serv.,* 577 F.3d 479, 489 (2d Cir.2009) (quoting *Kendall v. Emps. Ret. Plan of Avon Prods.,* 561 F.3d 112, 118 (2d Cir.2009) (alteration in original)); *see also Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.,* 356 F.3d 365, 373 (2d Cir.2004) ("To meet Article III's constitutional requirements for standing, a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant." (citation and internal quotation marks omitted)).

To meet Article III's injury-in-fact requirement, plaintiff's alleged injury "must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical.' " *Baur v. Veneman,* 352 F.3d 625, 632 (2d Cir.2003) (additional quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Furthermore, the alleged injury must "affect[ ] the plaintiff in a personal and individual way to confirm that the plaintiff has a personal stake in the controversy and avoid having the federal courts serve as merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." *Id.* (citations and internal quotation marks omitted). "The party invoking federal jurisdiction bears the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
**(Cite as: 2013 WL 1233544 (E.D.N.Y.))**

burden of establishing these elements," *Lujan,* 504 U.S. at 561, and the "fact of removal does not change plaintiffs' burden as to standing," *Mann v. GTCR Golder Rauner, LLC,* 483 F.Supp.2d 884, 894 (D.Ariz.2007).

In addition, for claims to be justiciable under Article III, "courts have long recognized that the controversy, as an initial matter, must be ripe." *Kittay v. Giuliani,* 112 F.Supp.2d 342, 348 (S.D.N.Y.2000) (citing *Marchi v. Bd. of Cooperative Educ. Servs.,* 173 F.3d 469, 478 (2d Cir.1999) and *Thomas v. City of N.Y.,* 143 F.3d 31, 34 (2d Cir.1998)), *aff'd,* 252 F.3d 645 (2d Cir.2001). " 'The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' " *N.Y. Civil Liberties Union v. Grandeau,* 528 F.3d 122, 130 (2d Cir.2008) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003)). "Both are concerned with whether a case has been brought prematurely, but they protect against prematureness in different ways and for different reasons. The first of these ripeness requirements has as its source the Case or Controversy Clause of Article III of the Constitution, and hence goes, in a fundamental way, to the existence of jurisdiction. The second is a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it." *Simmonds v. I.N.S.,* 326 F.3d 351, 357 (2d Cir.2003).

*6 Although the plaintiff must independently establish that it has standing to bring this action, and that its claim is ripe, the Court will analyze these inquires together because this case concerns whether plaintiff's injury is currently concrete, and not hypothetical, which implicates both standing and ripeness. *See Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 225–26 (2d Cir.2006) ("Because LSC's ripeness arguments concern only that shared requirement—*i.e.,* LSC challenges the claim's ripeness on essentially the same

grounds as those related to the plaintiffs' standing—it follows that our analysis of LSC's standing challenge applies equally and interchangeably to its ripeness challenge. We therefore do not address ripeness separately, but consider it together with, and as part of, the standing inquiry."), *abrogated on other grounds by Bond v. United States,* —— U.S. ——, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011); *Thomas,* 220 F.3d at 1138 ("The overlap between these concepts has led some legal commentators to suggest that the doctrines are often indistinguishable.")

2. Analysis
Whether analyzed under the doctrines of standing or ripeness, plaintiff has not satisfied its burden of demonstrating that it has satisfied the case or controversy requirement of Article III. In Counts I–XIV of the complaint, plaintiff alleges that defendants' actions have caused the Trust to lose its REMIC status. However, this injury is currently "hypothetical." *Lujan,* 504 U.S. at 560. The IRS has not determined that the Trust is no longer entitled to its REMIC status, and plaintiff has not alleged that the Trust has had any tax liability imposed upon it.

Although it does not appear that any other court has confronted this exact situation, courts have reached the same conclusion under similar circumstances. In *Scanlan v. Kodak Retirement Income Plan,* 678 F.Supp.2d 110 (W.D.N.Y.2010), the court held that plaintiff could not bring an action when the complaint alleged only "potential tax consequences" and relied "upon an extended series of hypothetical events." *Id.* at 114. Although the plaintiff in *Scanlan* did not allege that the tax-status of the plan at issue was actually threatened in any way as plaintiff does here, *Scanlan* still demonstrates that a court cannot adjudicate a dispute where a plaintiff attempts to demonstrate injury-in-fact through potential tax liability. Similarly, in *Cole v. Cook,* No. 06–CV–1811, 2006 WL 3791680 (N.D.Oh. Dec. 22, 2006), the court held that plaintiff lacked standing because "[t]here is no al-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

legation that the IRS is seeking back taxes from Plaintiffs, [ ] that it has assessed any penalties against them [or that] [t]he IRS has issued [an] adverse ruling against Plaintiffs." *Id.* at *3. The court concluded that plaintiff's claim for indemnification for any negative tax consequences was "premature." *Id.* This Court agrees with these determinations that a plaintiff has neither satisfied Article III standing, nor demonstrated that its claim is ripe, when an injury is "contingent [on a] future event[ ] that may not occur as anticipated, or indeed may not occur at all." *Clinton v. Acequia, Inc.,* 94 F.3d 568, 572 (9th Cir.1996) (citations and internal quotation marks omitted); *see also Daines v. Alcatel, S.A.,* 105 F.Supp.2d 1153, 1156 (E.D.Wash.2000) (finding that plaintiff's claim that defendants advance plaintiff money to cover potential tax liability was "unripe" when it was "merely speculative" that plaintiff would be forced to pay the taxes that defendants were contractually obligated to pay should the IRS determine plaintiff had tax liability).

*7 At oral argument, plaintiff principally relied on two cases in support of its proposition that this case is ripe for adjudication. In *Nathel v. Siegal,* 592 F.Supp.2d 452 (S.D.N.Y.2008), the plaintiff sought a declaratory judgment that the defendants were liable for future (yet currently unassessed) tax penalties and for the cost of defending tax audits. *Id.* at 472. The court held that there was "no advantage in waiting for the proverbial ax to fall with respect to the ultimate assessment of penalties" and that the "hypothetical or uncertain nature of the IRS action is not fatal to Plaintiffs' claim." *Id.* at 473. However, *Nathel* is distinguishable from this action in several respects. First, in *Nathel,* plaintiffs were not only undergoing audits by the IRS, but the New York State Taxing Authorities had already imposed penalties. *Id.* Second, plaintiff here is not seeking damages for the cost of defending an audit, as the plaintiff did in *Nathel* . In addition, the court found that the complaint clearly demonstrated that there was a "practical likelihood" that some tax liability would be imposed. *Id.* By contrast, here the IRS has

not begun an investigation, plaintiff has not expended any resources defending an audit, and there is no "practical likelihood" that the Trust's REMIC status will be revoked. Accordingly, *Nathel* is not persuasive.

Plaintiff also relied at oral argument on *Stern & Co. v. State Loan & Finance Corp.,* 205 F.Supp. 702 (D.Del.1962). In *Stern,* the plaintiff sold the defendant a business, and the defendant agreed that it would represent to the IRS that the full consideration for the purchase was in stock. The plaintiff alleged that the defendant breached the contract when the defendant claimed on a tax return that half of the price of the purchase was in consideration for a convent not to compete. *Id.* at 703. The court held that it may issue a declaratory judgment in a dispute involving potential tax consequences to determine whether a contract has been breached. The court stated that it "may not determine tax liability; but it may determine facts which may have a direct, even immediate, bearing on what the tax liability will be." *Id.* at 706 (footnote omitted). *Stern* is distinguishable because the court had to determine whether there was a breach of contract, regardless of the tax consequences, whereas here, plaintiff cannot demonstrate that a breach occurred until there *are* tax consequences. To the extent that *Stern* stands for the general proposition that a court may entertain a breach of contract dispute although a plaintiff has not yet suffered adverse tax consequences (and therefore has not suffered an injury-in-fact), the Court no longer believes that the reasoning of *Stern* is good law in the wake of *Lujan* and its progeny.

Plaintiff argues that tax liability is imposed as a matter of law, and that defendants' actions have already violated the PSA regardless of whether the IRS actually collects additional taxes. (*See* Pl.'s Opp'n at 13.) However, plaintiff's interpretation of tax law may be incorrect. If the Court were to allow this case to proceed prior to an IRS determination and plaintiff was victorious in this lawsuit, but the IRS later determined that defendants did not en-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

danger the REMIC status, plaintiff would receive a windfall. The Court cannot decide a case with a hypothetical injury that may never occur. If the IRS and the Tax Court ever determine that the Trust may no longer be classified as a REMIC, plaintiff would have standing under Article III. However, until that time, plaintiff has not suffered an injury. Moreover, plaintiff will suffer no harm by waiting for its claims to become ripe. Accordingly, Counts I–XIV of the complaint are dismissed because plaintiff has not satisfied the case or controversy requirement of Article III.

### B. Contemporaneous Ownership Rule

*8 As acknowledged by plaintiff at oral argument, Count XV is the only claim in the complaint that is not dependent upon the Trust's REMIC status being potentially withdrawn. (*See* Oral Arg., Jul. 17, 2012 at 29–31.) Count XV is a breach of contract claim solely against LNR, and alleges that LNR breached the servicing standards set forth in the PSA by "servicing the Mortgage Loans in such a manner as to maximize its own fees regardless of the best interest of the Trust or the Certificateholders...." (Compl. ¶ 147; *see also id.* ¶¶ 25–33, 39–41, 145–49.) However, this claim is dismissed because plaintiff does not have standing to bring it due to the contemporaneous ownership rule.

### 1. Legal Standard

"In the context of shareholder lawsuits, an action must be asserted derivatively if the alleged injury was suffered by the corporation and thus by stockholders only through diminution in the value of their shares .... " *Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust,* 95 CIV. 9426, 1996 WL 601705, at *2 (S.D.N.Y. Oct.18, 1996) (citation and internal quotation marks omitted); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,* 837 F.Supp.2d 162, 188 (S.D.N.Y.2011) ("It is well established in the context of shareholder litigation that 'where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, *only* the corporation itself, its receiver,

or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer.' " (quoting *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1118 (2d Cir.1975) (alterations omitted))). "Typically, allegations of mismanagement or breach of fiduciary duty must therefore be brought derivatively ...." *Dallas Cowboys,* 1996 WL 601705, at *2 (collecting cases under New York law). Breach of contract actions must also be brought derivatively if plaintiff "cannot prevail without showing injury to the [corporation] itself." *Druck Corp. v. Macro Fund Ltd.,* 290 F. App'x 441, 443 (2d Cir.2008).

Under both the Federal Rules of Civil Procedure and New York law, a plaintiff does not have standing to bring a derivative suit unless she owned shares in the corporation at the time of the alleged wrongdoing. *See* Fed.R.Civ.P. 23.1(b)(1) (stating that a complaint must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of"); N.Y. Bus. Corp. Law § 626(b) (stating that a plaintiff must be "a holder at the time of bringing the action and that he was such a holder at the time of the transaction of which he complains"); *see also In re Bank of N.Y. Derivative Litig.,* 320 F.3d 291, 293 (2d Cir.2003) ("[B]oth [ Fed.R.Civ.P. 23.1 and N.Y. Bus. Corp. Law § 626(b) ] require that, in order to have standing to bring a shareholder derivative action, a plaintiff must have owned stock in the company at the time of the alleged wrongdoing.").[FN4]

*9 The "main purpose" of the contemporaneous ownership rule is to "prevent courts from being used to litigate purchased grievances." *Id.* at 297 (alterations, citation, and internal quotation marks omitted). Therefore, "a stranger to the corporation who buys stock with knowledge of the alleged wrongs may not maintain a derivative action even if the wrongs complained of are continuing wrongs ...." *Bateson v. Magna Oil Corp.,* 414 F.2d 128, 131 (5th Cir.1969); *see also In re Omnivision Techs., Inc.,* Nos. C–04–2297, C–04–2443, C–04–2518, 2004 WL 2397586, at *3 (N.D.Cal.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
**(Cite as: 2013 WL 1233544 (E.D.N.Y.))**

Oct.26, 2004) (continuing harm exception only applies when "there is no evidence of an improper motive on the part of the [p]laintiffs"); *Brambles USA, Inc. v. Blocker,* 731 F.Supp. 643, 652 (D.Del.1990) ("As a matter of policy, one who buys shares with knowledge of a purported wrongdoing should not be permitted to bring suit to challenge that wrongdoing."); *Leventhal v. Haehl,* No. 88–CV–569, 1989 WL 55972, at *2 (N.D.N.Y. May 26, 1989) (citing *Bateson* and finding that plaintiff lacked standing under Rule 23.1 because he purchased his stock two weeks after the announcement of an investigation into wrongdoing).

The continuing wrong doctrine is generally considered an "equitable exception to the contemporaneous ownership rule." *In re Bank of N.Y.,* 320 F.3d at 298. "[W]hen a series of wrongful transactions is alleged and some of them transpired before plaintiff became a shareholder but others took place subsequent to that date, the shareholder's action may be maintained only on the basis of the later events." *Id.* at 297 (citation and internal quotation marks omitted). Some courts have stated that the exception does not apply within this Circuit. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.,* Nos. Nos. 12 Civ. 4156, 12 Civ. 7549, 12 Civ. 7553, 12 Civ. 7815, 2013 WL 525158, at *17 (S.D.N.Y. Feb.13, 2013) (stating that "this Circuit does not appear to recognize the doctrine"); *Silverstein ex rel. Tetragon Fin. Grp. Ltd. v. Knief,* 843 F.Supp.2d 441, 445 (S.D.N.Y.2012) (stating that the Second Circuit has "reject[ed] the continuing wrong doctrine adopted by some other courts"). However, the Second Circuit has stated that "the continuing wrong doctrine is less an exception to the contemporaneous ownership rule than an expansive definition of what constitutes a 'transaction,' " *In re Bank of N.Y.,* 320 F.3d at 298 (citation and internal quotation marks omitted), and that the Circuit has interpreted the definition of transaction extremely narrowly, *id.* ("[W]e decline to adopt the expansive definition of the term 'transaction' that is inherent in the continuing wrong doctrine."). Specifically, the Second Circuit

has held that although a plaintiff need not have owned stock "in the company during the entire course of all relevant events," a plaintiff "must have acquired his or her stock in the corporation before the core of the allegedly wrongful conduct transpired." *Id.; see also Lerner v. Allaire,* No. 02–CV–964, 2003 WL 22326504, at *3 (D.Conn. Sept. 30, 2003) (citing *In re Bank of New York* and holding that plaintiff did not have standing because he did not own stock in the corporation "before the 'core' of the wrongful conduct alleged in his complaint transpired").

### 2. Analysis
**\*10** As a threshold matter, plaintiff argues that this lawsuit is not a derivative action because plaintiff is not "seeking to enforce a right of the Trust," but is "suing in its own right as a third-party beneficiary of the PSA." (Pl.'s Opp'n at 10.) This argument is unpersuasive. The case law is clear that an injury that is "equally applicable to all shareholders must be brought as a derivative action," *Dallas Cowboys,* 1996 WL 601705 at *2 (citation and internal quotation marks omitted), even if that action is a breach of contract claim, *Druck,* 290 F. App'x at 443. In addition, the PSA itself states that Certificateholders may not enforce rights in the agreement unless it is "for the equal, ratable and common benefit of all Certificateholders." (Mallon Decl. Ex. A, Pooling and Servicing Agreement, at 289.) Plaintiff is not asserting that it has been uniquely injured, but that all Certificateholders have been injured because the Trust is worth less due to defendants' actions. Therefore, this lawsuit must be brought derivatively.

Because this is a derivative action, plaintiff must satisfy the contemporaneous ownership rule as provided under both federal and New York law. Plaintiff was formed on October 26, 2011, and bought shares in the Trust sometime after that date. However, according to the complaint, the primary conduct for which this lawsuit was brought occurred over two years before plaintiff's formation. (Compl.¶ 38.) Although the Court is analyzing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

whether Claim XV, which does not involve the Trust's potential loss of REMIC status, may proceed, the Second Circuit has explicitly held that the shareholder "must have owned stock in the corporation throughout the course of the activities that constitute the *primary basis of the complaint." In re Bank of N.Y.,* 320 F.3d at 298 (emphasis added). Therefore, because plaintiff did not own shares in the Trust at the time of the primary alleged wrongdoing, plaintiff does not have standing to bring this derivative action.

Even assuming that the Court need only analyze whether a shareholder owned stock throughout the course of activities that constitute the primary alleged wrongdoing *in a specific count of a complaint,* plaintiff's claim still fails because it purchased shares in the Trust after it knew of the LNR's alleged self-dealing. Plaintiff admitted at oral argument that this case is a purchased grievance. Therefore, even if some of the alleged wrongdoing as defined in Count XV continued after plaintiff purchased shares in the Trust, and that wrongdoing additionally satisfied the Second Circuit's narrow definition of transaction for determining whether there has been a continuing wrong, plaintiff does not have standing under Rule 23.1 or Section 626(b) because it purchased shares in the Trust with the knowledge of LNR's alleged wrongdoing. *See Bateson,* 414 F.2d at 131.

New York General Obligations Law § 13–107 is not to the contrary. Section 13–107 states that "a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist." This provision was enacted so that existing claims for damages against a trustee would automatically transfer, even in the absence of an express agreement between the transferor and the transferee. *See Bluebird Partners, L.P. v. First Fidelity Bank, N.A.,* 97 N.Y.2d 456, 461, 741 N.Y.S.2d 181, 767 N.E.2d 672 (2002). However, "[b]y its terms, § 13–107 is plainly limited to claims against the obligor, the indenture trustee or depositary, or the guarantor of

the obligation." *Ellington Credit Fund,* 837 F.Supp.2d at 183. Since LNR is not an obligor, indenture trustee, depositary, or guarantor, Section 13–107 does not invalidate the contemporaneous ownership rule or act as a safety value to confer standing on plaintiff. Accordingly, Count XV is dismissed.

### C. No–Action Clause
**\*11** Even assuming *arguendo* that plaintiff can demonstrate that it did not know of LNR's alleged misconduct when it became a Certificateholder, Count XV is also dismissed because plaintiff has not satisfied the no-action clause of the PSA.

#### 1. Legal Standard
No-action clauses are "standard provision[s]" that are present in many trust agreements. *Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.,* 677 F.3d 1286, 1298 (11th Cir.2012). Such clauses state that a shareholder must satisfy certain requirements before bringing a lawsuit on behalf of the shareholders, including giving a trustee an opportunity to bring a lawsuit on behalf of the trust. "The primary purpose of a no-action clause is [ ] to protect issuers from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors.... They protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective economic interest." *Feldbaum v. McCrory Corp.,* 18 Del. J. Corp. L. 630, 642 (Del.Ch.1992) (unpublished opinion).

Courts routinely enforce these no-action clauses to bar shareholders from bringing lawsuits. *See, e. g., Akanthos,* 677 F.3d at 1298; *Peak Partners, LP v. Republic Bank,* 191 F. App'x 118, 126–27 (3d Cir.2006); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,* 837 F.Supp.2d 162, 187 (S.D.N.Y.2011); *Walnut Place LLC v. Countrywide Home Loans, Inc.,* 96 A.D.3d 684, 684–85, 948 N.Y.S.2d 580 (1st Dep't 2012). While

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

no-action clauses have not been enforced when they would result in the "absurd[ity]" of asking "the [t]rustee to sue itself," *Cruden v. Bank of N.Y.,* 957 F.2d 961, 968 (2d Cir.1992), these clauses have been enforced when they would require the trustee to sue one of the other managers of the trust that the trustee is required to supervise, *see Ellington,* 837 F.Supp.2d at 186–87.

### 2. Analysis

The PSA in this case provides that "no Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit" unless it: (1) gives "the Trustee and the Paying Agent a written notice of default hereunder"; (2) represents 25% of a class of Certificateholders; (3) "made written request upon the Trustee to institute such action ... in its own name as Trustee"; and (4) "offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein ...." (Mallon Decl. Ex. A, Pooling and Servicing Agreement, at 289.) The Certificateholder is only required to give the "notice of default," and does not need to satisfy the other provisions, "in the case of a default by the Trustee." (*Id.*) The Certificateholder is not required to give the "notice of default" if a "Responsible Officer of the Trustee has actual knowledge" of the default. (*Id.* at 265.)

**\*12** Plaintiff does not contend that it provided a "notice of default" to the Trustee. Instead, plaintiff claims that Wells Fargo "unquestionably had actual knowledge of the creation of the SPEs and the assignment of Mortgage Loans." (Pl.'s Opp'n at 7.) However, plaintiff's complaint does not allege that Wells Fargo had actual knowledge of the misconduct alleged in Count XV. For this reason alone, plaintiff's claim should be dismissed as no-action clauses must be "strictly construed." *Cruden,* 957 F.2d at 968.

However, even if the Trustee had actual knowledge, plaintiff would still be required to satisfy the other provisions of the noaction clause. Plaintiff claims that it was not required to do so for two reasons. First, plaintiff contends that it was not required to make a written request upon the Trustee regarding LNR's misconduct because the Trustee was conflicted, and thus, it would result in the same "absurd[ity]" that the Second Circuit warned against in *Cruden.* (Pl.'s Opp'n at 6.) Second, plaintiff argues that it was not required to satisfy the other requirements of the no-action clause because there was a "default by the Trustee" which excused its performance of the requirements. (*Id.* at 7.) For the reasons set forth below, both of plaintiff's arguments are unpersuasive.

In *Cruden,* the Second Circuit stated that a shareholder is not required to ask the trustee to sue itself. 957 F.2d at 968. Plaintiff states that the same absurdity is present here because any "action taken by Wells Fargo against LNR would necessarily require that Wells Fargo confirm its own liability." (Pl.'s Opp'n at 6.) That is simply not the case. The misconduct that plaintiff alleges LNR committed in Count XV does not implicate Wells Fargo in any wrongdoing. Furthermore, courts have explicitly held that it is not akin to asking the trustee to bring an action against itself when the request is to sue a servicer or another manager of the trust, even if it may implicate some misconduct by the trustee. *See Peak Partners,* 191 F. App'x at 126–27 (holding that no-action clause barred suit against servicer for negligence); *Ellington,* 837 F.Supp.2d at 186–87 (holding that the no-action provision did not bar a lawsuit against the trustee but did bar a lawsuit against the servicers, and that plaintiffs' allegation of a conflict of interest between the trustee and the servicer was "entirely conclusory"); *Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.,* 09 C 6904, 2010 WL 3324705, at \*5 (N.D.Ill. Aug.20, 2010) ("There is an important difference between asking the trustee to sue itself—an 'absurd' requirement that we presume the parties did not intend—and asking it to sue a third party, even when the investor alleges wrongdoing by the trustee."). Therefore, *Cruden* is not applicable to this action against LNR, and plaintiff was required to request that Wells Fargo bring a suit against LNR.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
(Cite as: 2013 WL 1233544 (E.D.N.Y.))

Plaintiff also argues that failure to comply with the no-action clause be excused because the PSA does not require a certificateholder to comply with the 25%, written request, and indemnity provisions "in the case of a default by the Trustee." Plaintiff argues that "such a default has occurred and has been properly pleaded here." (Pl.'s Opp'n at 7.) To support this argument, however, plaintiff only cites sections of the complaint that do not relate to Count XV. Even construing plaintiff's complaint broadly, the Court cannot determine how a default by the Trustee could have occurred through LNR's alleged wrongdoing. If this argument were permitted, then no-action clauses would never be enforced to bar lawsuits against servicers because plaintiffs' allegations of the negligence itself would render the noaction clause moot. Since these no-action clauses must be "strictly construed," *Cruden,* 957 F.2d at 968, and be "given a consistent, uniform interpretation," *Akanthos,* 677 F.3d at 1298 (citation and internal quotation marks omitted), the Court finds that plaintiff was not excused from complying with the no-action clause in the PSA. Accordingly, Count XV is also dismissed on this alternative ground.

### D. Leave to Replead
*13 Although plaintiff has not requested leave to re-plead the complaint, the Court has considered whether plaintiff should be given an opportunity to re-plead its claims. Under Rule 15(a) of the Federal Rules of Civil Procedure, the "court should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a) (2). However, even under this liberal standard, this Court finds that any attempt to amend the pleading in this case would be futile. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ( "Repleading would [ ] be futile. Such a futile request to replead should be denied."). As discussed in detail *supra,* it is clear that Counts I–XIV are not ripe, and that no amendment to the pleading could cure that defect. As for Count XV, plaintiff has conceded that it purchased shares in the Trust with knowledge of the alleged wrongdoing, and thus, cannot satisfy the contemporaneous

ownership doctrine by amending the complaint. Moreover, no pleading could overcome the fact that plaintiff cannot bring a lawsuit against LNR due to its failure to comply with the no-action clause of the PSA. Therefore, "granting leave to amend would be unproductive and dismissal with prejudice is appropriate." *Ackerman v. Doyle,* 43 F.Supp.2d 265, 275 (E.D.N.Y.1999).

### IV. CONCLUSION
For the foregoing reasons, defendants' motion to dismiss the complaint is granted in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

FN1. Because the complaint makes "a clear, definite and substantial reference" to the PSA, the Court may consider the PSA on a motion to dismiss because it has been incorporated by reference. *DeLuca v. AccessIT Grp., Inc.,* 695 F.Supp.2d 54, 60 (S.D.N.Y.2010) (citations and internal quotation marks omitted).

FN2. "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Global Network Commc'ns, Inc. v. City of N.Y.,* 458 F.3d 150, 157 (2d Cir.2006) (internal citation and quotation marks omitted).

FN3. *See, e.g., Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.,* No. 05–Civ–6701, 2010 WL 743839, at *4 (S.D.N.Y. Mar.3, 2010) (taking judicial notice of document on file with California Secretary of State).

FN4. Plaintiff argues that Rule 23.1 does not apply to actions removed to federal court based on federal jurisdiction. (*See* Pl .'s Opp'n at 9 (citing *Jablow v. Agnew,* 30 F.Supp. 718, 719 (S.D.N.Y.1940).) At

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)
**(Cite as: 2013 WL 1233544 (E.D.N.Y.))**

least one court has stated that the rule "must apply to suits in the federal court where jurisdiction is based on a federal question as well as suits where jurisdiction is based on diversity of citizenship." *Gottesman v. Gen. Motors Corp.,* 28 F.R.D. 325, 326 (S.D.N.Y.1961). This Court sees no reason why Rule 23.1 should not also apply to actions removed to federal court based on a federal question. *See Jacobson v. General Motors Corp.,* 22 F.Supp. 255, 258 (S.D.N.Y.1938) (stating, pre-*Gottesman,* that whether Rule 23.1 applies depends on whether a case has been removed to federal court based on diversity jurisdiction or based on federal question jurisdiction, but, "[i]f the matter were one of first impression, it might be more logical to hold that there should be no distinction between the two classes of cases"). In any event, even if Rule 23.1 did not apply to this action, plaintiff would still need to satisfy the contemporaneous ownership rule because, as the Second Circuit has recognized, New York State law also requires a plaintiff to satisfy the rule. *See In re Bank of N.Y. Derivative Litig.,* 320 F.3d at 293.

E.D.N.Y.,2013.
SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.
--- F.Supp.2d ----, 2013 WL 1233544 (E.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Matthew D. Stachel, hereby certify that on April 11, 2013, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on April 11, 2013, the attached document was Electronically Mailed

to the following person(s):

Joseph J. Farnan, Jr.
Joseph J. Farnan, III
Brian E. Farnan
Farnan LLP
919 N. Market Street
12th Floor
Wilmington, DE 19801
farnan@farnanlaw.com
jjfarnan@farnanlaw.com
bfarnan@farnanlaw.com

Daniel E. Bacine
Barrack, Rodos & Bacine
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
dbacine@barrack.com
jpalley@barrack.com

Alexander Arnold Gershon
William J. Ban
Michael A. Toomey
Barrack Rodos & Bacine
425 Park Avenue, Suite 3100
New York, NY 10022
agershon@barrack.com
wban@barrack.com
mtoomey@barrack.com

Samuel M . Ward
Barrack, Rodos & Bacine
One America Plaza
600 West Broadway, Suite 9 00
San Diego, CA 92101
sward@barrack.com

By:   /s/ Matthew D. Stachel
      Richard L. Horwitz
      Peter J. Walsh
      Matthew D. Stachel
      POTTER ANDERSON & CORROON LLP
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      pwalsh@potteranderson.com
      mstachel@potteranderson.com

1101825 / 36664